# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| REPUBLIC WINDOWS & DOORS, LLC, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Case No. 08-34113 |
| | ) | |
| _____ | ) | |
| | ) | |
| PHILLIP D. LEVEY, not individually, but solely in | ) | |
| his capacity as duly appointed Chapter 7 Trustee | ) | |
| of the Bankruptcy Estate of Republic Windows | ) | |
| & Doors, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No.  10-2513 |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD GILLMAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION ON SPIELMAN DEFENDANTS' MOTION to DISMISS (Dkt. No. 93)

This matter is before the Court on the Motion of Defendants Ronald Spielman, Sherry Spielman, RWD Properties, LLC and RS Windows & Doors, LLC to dismiss this adversary proceeding pursuant to Federal Rules of Civil Procedure 12(b)(6) and 8 for failure to state a claim upon which relief can be granted.

For the reasons noted herein the court will enter a separate order granting the motion in part.

## I. FACTS

Plaintiff, Trustee Phillip D. Levey ("Trustee"), alleges in the First Amended Complaint that Republic Windows & Doors ("Republic") (originally known as Republic Aluminum) was a family-owned business that operated a manufacturing concern in Chicago for 40 years, with annual sales in the tens of millions of dollars. He alleges that by 2004 the owners and insiders of Republic Windows & Doors stopped focusing on maintaining the business and instead focused on looting the assets of the company for themselves.  He alleges that the Defendants executed a series of restructuring transactions that benefitted the insiders by depriving the company of its most valuable asset, the real estate that housed the company's manufacturing facility.  He complains of the usurpation of valuable business opportunities that were exploited by insiders and transfers the insiders made of company property to themselves and others.  He alleges that a thriving business with hundreds of employees was deprived of its assets and forced out of business.

The Trustee maintains that the conduct complained of crystallized in 2008 when the Debtor's insiders raided the company's manufacturing facility.  The insiders are alleged to have loaded the company's manufacturing equipment onto semi-trailers for relocation to a competing window manufacturer owned by the insiders and their affiliates.  Defendant Richard Gillman has been charged with a felony for crimes committed in connection with the efforts described herein.

The Trustee alleges that the Debtor, Republic Windows & Doors, LLC ("Debtor"), is the successor in interest to Republic Window & Doors, Inc. a/k/a Republic Holdings Corporation ("RHC").  He posits that the Debtor is the alter ego of those entities and another entity, RWD Properties, LLC ("RWD"), in that the Debtor was created to be a continuation of the business operations of those entities.  He argues that the Debtor was created as a vehicle by which its alter ego, Republic

Windows & Doors, Inc., could be stripped of its real estate asset for the benefit of insiders. The issue is whether the maintenance of corporate formalities between Republic Window & Doors, Inc. and the Debtor would work an injustice on the Debtor and its creditors.

This adversary proceeding involves a series of complex transactions and relationships between related entities and individuals. At various times Defendants Richard B. Gillman ("Gillman"), Ronald Spielman ("Spielman"), Barry W. Dubin ("Dubin"), Michael Kayman ("Kayman") and Timothy Widner ("Widner") acted in various capacities, individually and through entities they controlled, as owners, officers, managers, agents or insiders of the Debtor.

Gillman was at various times a manager, director or chief executive officer of the Debtor.

Spielman was at various times a manager or chief executive officer of the Debtor.

RWD Properties, LLC ("RWD") is an Illinois limited liability company which was owned by Spielman and Gillman.

RS Windows & Doors, LLC ("RS") is an Illinois limited liability company, alleged to be owned by Spielman.

Dubin was once the Debtor's chief operating officer.

Kayman, an attorney who once performed legal services for Debtor, was hired to manage the Debtor's operations and was once a director of the Debtor.

Sherry Spielman is the wife of Ronald Spielman.

Widner was once the Debtor's director of manufacturing.

Realization Advisors, Inc. ("RAI"), alleged to be owned by Kayman, provided turnaround advice to the Debtor. The Trustee also alleges that RAI had an indirect ownership interest in the Debtor.

David Schabes ("Schabes") was once a director of the Debtor while employed by Chase Financial Group ("Chase"), one of the Debtor's lenders and equity holders.

Murray Gross ("Gross") was once one of the Debtor's directors.

Sharon Gillman is the wife of Richard Gillman.

Lloyd Gillman is Richard Gillman's brother and the owner of ABC Glass Enclosures, LLC ("ABC"), a customer of Republic.

Windows by Bob, LLC ("Windows by Bob") is an Illinois limited liability company.

International Fenestration Partners, Inc. ("IFP") may have been used by Gillman, Widner and others to siphon assets from the Debtor.

TKDO, LLC ("TKDO") is an Illinois limited liability company used by Widner and possibly others to siphon assets from the Debtor. Widner is alleged to be TKDO's registered agent.

Brian Elias ("Elias") is alleged to be the owner of Hansen Windows

("Hansen"), a customer of the Debtor.

Echo Windows & Doors, LLC ("Echo") is an Ilinois limited liability company for which Sharon Gillman served as registered agent.

According to the Trustee, William Spielman founded Republic Aluminum as a manufacturer of aluminum doors and windows in 1964.  It was located on the north side of Chicago for 33 years.  In 1997 Republic Aluminum changed its name to Republic Windows & Doors, Inc.  Ronald Spielman assumed control of the company.  Gillman joined the company in 1974 as a salesman.  He later married Sharon Spielman, William Spielman's niece.  Spielman later became Republic's Executive Vice President.

By 1996 the company outgrew its facility located at 1725 W. Diversey in Chicago.  As an incentive to keep the company in Chicago, the City of Chicago ("Chicago" or "City") provided Tax Incremental Financing ("TIF") to partially fund the construction of a new manufacturing facility on Goose Island at 930 W. Evergreen Avenue, Chicago (the "Goose Island Property").

The Goose Island Property cost more that $30 million to develop.  The company received $10.4 million in TIF Funding in exchange for an agreement to create jobs and develop a manufacturing plant at the Goose Island Property.  The balance of the funding was lent by Bank One (n/k/a Chase).  Chase also provided the company a working line of credit.  Chase's loans were secured by all of the company's assets, including the Goose Island Property, the company's accounts receivable and its equipment.

The TIF Funding was contingent upon the company remaining a viable business entity and employing a certain number of employees.  The company was

obligated to repay the City $10 million in the event certain benchmarks of development were not met. The TIF Funding penalties are alleged to have expired in 2006. The Trustee alleges that the Debtor's insiders guaranteed the company's obligations to the City.

### a. IMPROPER TRANSACTIONS

By 2002 Chase put the company's loans in "workout" status. Rather than bankrupt the company and trigger the penalties of the TIF Funding guaranties, the Trustee alleges that Spielman and Gillman formulated an exit strategy to mine a profit from the company's only asset, the Goose Island Property. The plan entailed having the company shed its manufacturing arm, while avoiding any conduct that could trigger the TIF Funding penalties. To that end the Trustee alleges that in November, 2004 Spielman and Gillman changed the name of Republic Window & Doors, Inc. to Republic Holdings Corporation. RHC was owned 80% by Spielman and 20% by Gillman. On November 4, 2004 RHC transferred the Goose Island Property to RWD Properties, LLC, allegedly for no consideration. RHC was the sole owner of RWD Properties, LLC. The Goose Island Property was worth more than $30 million when these transactions occurred. The Trustee alleges that as the sole owners of RWD Properties, LLC, Spielman and Gillman received a substantial benefit for no consideration as a result of the Goose Island Property Transfer. As part of the transaction RWD Properties, LLC entered into a refinancing transaction with Prudential Mortgage Capital Company, LLC which provided $23 million to RWD Properties, LLC. The funds were used to pay down Chase's loan to Republic Windows & Doors, Inc. At the same time as the Goose Island Property Transfer, Republic Holdings Corporation transferred its windows and doors operations and its liabilities to a new entity, Republic Windows & Doors, LLC, the Debtor. According to the Trustee, Spielman and Gillman caused the Debtor to enter into a lease with RWD Properties, LLC, pursuant to which the Debtor paid sums sufficient in amount

to cover RWD Properties, LLC's debt service to Prudential and the tax, insurance and maintenance expenses of the Goose Island Property.  The Trustee alleges that aside from not holding title to the Goose Island Property, the Debtor was exactly the same entity as its predecessor, Republic Holdings Corporation, whose predecessor was Republic Windows & Doors, Inc.  According to the Trustee, the purpose of the Goose Island Property Transfer was to strip the Debtor of its valuable real estate while burdening it with equal or greater liabilities than it had before.  As a result, the Debtor is alleged to have been stripped of $8 million in equity and rendered insolvent.

Following the Goose Island Property Transfer, the Trustee alleges that business worsened for the Debtor but that Spielman and Gillman refused to take necessary actions to turn the Debtor around because to do so could have triggered the TIF Funding penalties and their personal liability on the guaranties.   In 2005 Chase insisted that Spielman leave the Debtor; an agreement was reached whereby Spielman would sell his interest in the Debtor.  Republic Holdings Corporation, the Debtor and a company known as NFI, LLC ("NFI") entered into the Republic Windows & Doors, LLC Acquisition Agreement (the "Acquisition Agreement"). Pursuant to the Acquisition Agreement, Spielman and Republic Holdings Corporation transferred their 90% ownership in the Debtor to NFI.  According to the Trustee NFI was initially owned 75% by Gillman and 25% by William Harris Smith ("Smith").

The Trustee also alleges that even though the Debtor did not acquire Spielman's interest in Republic Holdings Corporation, Spielman and Gillman caused the Debtor to transfer the following valuable assets to Spielman and his wife, Sherry Spielman: life insurance policies and their cash value that were owned by the Debtor; compensation paid to Spielman couched as consulting fees; health insurance benefits for him and his family; commissions of 5% related to a City of Chicago Lead

Abatement Program and accounts receivable due the Debtor from various customers.

The Trustee also alleges that on December 28, 2005 pursuant to an Acoustical and Lead Abatement Business Agreement, the Debtor assigned its interest in certain sound insulation projects and contracts to RS Windows & Doors, LLC, an entity owned by Spielman, for no consideration.

The Trustee alleges that on December 28, 2005 Spielman executed a corporate resolution authorizing the Debtor to release him from all liability.  The Trustee alleges that the Debtor has likewise improperly executed releases of other affiliates and insiders for no consideration.

The Trustee also alleges that on November 21, 2006 the Debtor transferred $100,000 to Spielman for no consideration.

After Spielman left, Gillman kept the company's doors open until 2006 to avoid the TIF Funding penalties and guaranties, and to avoid Illinois' four-year statute of limitations on the prosecution of fraudulent transfers with respect to the Goose Island Property Transfer.

In 2005, Gillman caused the Debtor to retain Realization Advisors, Inc. and Kayman to perform turnaround consultant services.  Dubin, a former employee of RAI, became the Debtor's chief operating officer.  The Trustee alleges that Dubin, Kayman, Gillman and possibly Spielman had multiple communications regarding whether the Goose Island Property Transfer was a fraudulent transfer under Illinois law.

### b. RWD PROPERTIES, LLC SOLD THE GOOSE ISLAND PROPERTY

On March 20, 2006, RWD Properties, LLC sold the Goose Island Property to William Wrigley, Jr. Company for $31.5 million (the "Wrigley Sale"). After paying the senior lender and other expenses, RWD Properties, LLC netted approximately $8 million. RWD transferred $6,269,181.37 to Spielman and $1,767,295.34 to Gillman from the sale proceeds. Spielman and Gillman agreed to place $3 million of those amounts in Chase accounts. The Trustee argues that Spielman and Gillman did not provide reasonably equivalent value for the amounts they received and that as a result of the transfers to Spielman and Gillman, RWD was rendered insolvent. According to the Trustee, members of the board discussed whether the transfer was a fraudulent transfer under Illinois law. After March, 2006, Wrigley leased the building to the Debtor and remained its lessor until the Debtor stopped paying rent in 2008.

### c.  SALARY TRANSFERS ALLEGED TO BE FRAUDULENT

The Trustee alleges that Gillman, Kayman and Dubin considered a "friendly foreclosure sale" in which a new company headed by Gillman would buy the Debtor's assets and continue its operations free of debt. To that end Gillman is alleged to have resigned as the Debtor's manager, effective on August 1, 2006. On August 1, 2006 Kayman became the manager and chief executive of the Debtor. Kayman resigned that position on October 24, 2006 at which time Gillman became the Debtor's manager again.

The Trustee alleges that Gillman performed no services for the Debtor from August 1, 2006 through October 24, 2006. However, the Debtor paid Gillman a salary and other amounts during that period.

Chase, Gillman and Smith agreed that effective February 1, 2007 Chase would convert its debt to equity in exchange for a 60% ownership interest in the

Debtor. At the same time LaSalle Bank (n/k/a Bank of America) provided Debtor with new secured financing. Pursuant to the restructuring NFI transferred its ownership interest to a new entity, IVW, LLC ("IVW"). IVW was owned 59% by NFI, LLC; 40% by Chase Capital Corporation and 1% by Gillman. Smith was eliminated as an owner of NFI; he transferred his interest to the Tin Man Extraordinaire Trust ("Tin Man"). Gillman transferred a portion of his interest in NFI to Dubin and another portion to RAI. As a result NFI was owned as follows: Gillman 64%; Tin Man 25%; Dubin 8% and RAI 3%. Chase required that Schabes be elected to the Debtor's board to protect its interests.

The Trustee alleges that Gillman caused the Debtor to assign to him life insurance policies in which the Debtor was the beneficiary for insufficient consideration. Gillman is also alleged to have caused an entity known as CWV, LLC to be merged into the Debtor, causing the Debtor to assume a $230,000 liability to Larry fields for no consideration.

### d. IMPROPER BONUSES

The Trustee alleges that Gillman and Dubin caused the Debtor to issue them and RAI bonuses for "positive contributions." Gillman received $320,000; Dubin received $65,000; RAI received $60,000.

### e. TRANSFERS TO ABC GLASS ENCLOSURE, LLC

The Trustee alleges that Lloyd Gillman owned ABC Glass Enclosures, LLC and that to enrich ABC at Debtor's expense, Richard Gilman and other insiders allowed ABC to take delivery of windows and related products on terms that exceeded the Debtor's credit limit for ABC. ABC is alleged to have resold the windows and products, without paying the full amount of the accounts receivable

associated with those products.

## f.  USURPATION OF CORPORATE OPPORTUNITY

Windows by Bob, LLC is alleged to have been formed by Gillman, Dubin and Kayman.  Windows by Bob sold windows through an independent network.  The Trustee alleges that sales made by Windows by Bob could have been made by the Debtor and that Gillman, Dubin and Kayman caused the Debtor to pay the expenses of Windows by Bob.  According to the Trustee Jim White ("White") was Windows by Bob's primary salesperson.  Gillman and Dubin are alleged to have caused White to be paid at least $65,000 by the Debtor for services White rendered to Windows by Bob.  The Debtor is alleged to have received no consideration for this transaction.  The Trustee characterizes this as a usurpation of the Debtor's corporate opportunity and a breach of the fiduciary duties owed to the Debtor by Gillman and Dubin.

## g.  USE OF DEBTOR'S FUNDS TO SET UP A COMPETING BUSINESS

The Trustee alleges that Gillman, Dubin, Widner and Kayman decided to loot the Debtor of cash and equipment by starting a successor business known as Echo Windows & Doors, LLC with the Debtor's cash and equipment.  They learned that a window manufacturing company in Red Oak, Iowa named Three Rivers Aluminum Company ("TRACO") was for sale.  Smith was asked to invest money to acquire the TRACO facility.  He agreed and formed Red Oak.  In October of 2008, Red Oak wrote letters to the Debtor's board offering to purchase all of the Debtor's assets.  Gillman, Dubin, Kayman and Widner ensured that if LaSalle Bank accepted the offer, Red Oak would purchase the Debtor's assets with the Debtor's money.  The Trustee alleges that Gillman, Dubin, Kayman and Widner used two sham corporations to

siphon money from the Debtor to pay the costs of shipping the equipment from Chicago to Iowa. One entity was Defendant International Fenestration Partners, Inc. The Trustee alleges that IFP issued fictitious invoices to the Debtor for goods that the Debtor did not receive. The Debtor is alleged to have transferred $202,103 to IFP. The second sham entity was TKDO, LLC, a company incorporated by Widner. TKDO was allegedly used to purchase tooling equipment for the machinery they intended to take from the Debtor. The Debtor was caused to pay for the tooling equipment ordered by TKDO.

Red Oak acquired TRACO's facility in November of 2008. The Trustee alleges that the Debtor's assets and consultants were used to prepare the materials to be used in the scheme, including the creation of a website.

In November and December of 2008, Gillman, Dubin, Kayman, Widner and Smith incorporated an entity known as Echo Windows & Doors, LLC. They had the Debtor's manufacturing equipment disconnected and loaded onto 10 trucks. Some of the equipment was sent to Red Oak, Iowa; some of it was put in storage. The Debtor paid the invoices for the moving company with checks drawn on IFP's account using money IFP received from the Debtor. The Trustee alleges that they had the Debtor's office equipment moved from the Goose Island Property.

The Trustee also alleges that Hansen Windows, a customer of the Debtor, was allowed to delay payment of debts it owed to the Debtor. Hansen was owned by Brian Elias. The purpose of the "slow pay" policy was to allow Elias to invest money in Echo. Echo may have been funded, in part, by the Debtor's forbearance from collecting on the amounts owed by Hansen.

### h. ECHO TAKES OVER TRACO

The Trustee alleges that on December 4, 2008 Gillman and Widner traveled to the Red Oak, Iowa facility that was formerly known as TRACO and announced that Echo was taking over TRACO's operations.  The Debtor shut its doors the following day with little notice to its employees, who were owed wages of $152,649.40 as of the date of the filing of the Debtor's petition for bankruptcy relief.

### i. CRIMINAL CHARGES AGAINST GILLMAN

Gillman was charged in a criminal case with theft of the Debtor's assets in September of 2009.

### j. OTHER IMPROPER TRANSFERS

The Trustee also alleges that Dubin resigned from the Debtor on November 30, 2008 at which time Gillman and Dubin caused the Debtor to transfer $27,000 to Dubin and prepaid the remaining amounts due on Dubin's car lease.

## II. STANDARDS

### a. DUTIES of DIRECTORS

The corporate law of the state of incorporation is controlling with respect to the fiduciary duties of an entity's directors and its other internal corporate affairs. *Treco, Inc. v. Land of Lincoln Savings & Loan,* 749 F.2d 374, 377 (7th Cir. 1984). The Defendants' conduct herein must be reviewed in light of Illinois' business judgment rule.

"Directors owe a fiduciary duty to their corporations and to its shareholders." *Stamp v. Touche Ross & Co.*, 263 Ill.App.3d 1010, 1015 (1st Dist. 1993).  They are to

-13-

administer the business of the corporations for the benefit of the stockholders and exercise their best skill and judgment in the management of the entity's business solely in the interest of the corporation. *Stamp*, 263 Ill.App.3d at 1015. If the directors exercise the degree of care which prudent men would exercise, they will not be held liable for honest mistakes. *Id.* The liability of directors is generally limited to acts of fraud, illegality or conflicts of interest. *Id.* at 1015-1016. Under the business judgment rule, the judgment of the directors of corporations enjoy the benefit of a presumption that their judgment was made in good faith and was designed to promote the best interests of the corporations they serve. "The rule applies to protect directors who have performed diligently and carefully and have not acted fraudulently, illegally or otherwise in bad faith." *Treco, at* 377 (quoting *Lower v. Lanark Mutual Fire Insurance Co.,* 114 Ill.App. 3d 462, 467 (1983)).

The Illinois Limited Liability Company Act provides, in part, that "[t]he fiduciary duties a member owes to a member-managed company and its other members include the duty of loyalty and the duty of care . . . ." 805 ILCS 180/15-3. "A member's duty of care . . . in the conduct of and winding up of the company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." 805 ILCS 180/15-3(c). Gross negligence and recklessness require a conscious and deliberate disregard for the rights or safety of others.

The Second Amended and Restated Republic Windows & Doors, LLC Operating Agreement, effective February 1, 2007 ("Operating Agreement") states that absent gross negligence, willful misconduct, or bad faith, managers cannot be held liable to the company for actions taken in good faith. Operating Agreement, ¶ 3.4.7. Case No. 08-34113, Adversary Proceeding 10-2513, Exhibit no. 1 to Schabes Motion to Dismiss Counts XVII and XVIII, Dkt, no. 91.

### b.  RULES 12(b)(6) and 8

The Court has reviewed the Trustee's First Amended Complaint regarding the movants' assertions that it fails to state claims upon which relief can be granted pursuant to Federal Rules of Civil Procedure 12(b)(6) and 8.  Those Rules have been made applicable to adversary proceedings by Federal Rules of Bankruptcy Procedure 7012 and 7008.  The Court finds that the Defendants' arguments based on Rules 12(b)(6) and 8 are groundless.  The Trustee's First Amended Complaint complies with the pleading standards set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1944 (2009).

To prevail on a motion to dismiss a complaint pursuant to Rule 12(b)(6) it must be clear in the pleadings that no set of facts could be proven in support of the plaintiff's claims that would entitle him to the relief requested.   *Panarus v. Liquid Carbonic Industries Corp.*, 74 F.3d 786, 791 (7th Cir. 1996).  As required by law, the Court accepts all factual allegations in the complaint as true.  *Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).  In addition, the Court construes all facts alleged in the First Amended Complaint in a light most favorable to the nonmoving party, the Trustee.  *Stoll v. Quintaur (In re Stoll)*, 252 B.R. 492, 495 (B.A.P. 9th Cir. 2000).  The Trustee's allegations, if true, show that he is entitled to the relief requested.

Rule 8 addresses whether a pleading provides sufficient notice of what a defendant is being accused of.  The First Amended Complaint provides ample notice of the grounds upon which the Trustee requests relief.   It will not be dismissed pursuant to Rule 8.

The Court finds that the Trustee's First Amended Complaint is sufficient as to the fraudulent transfer and breach of fiduciary duty allegations raised against Defendant Ronald Spielman.  The motion to dismiss as to Defendant Ronald

-15-

Spielman will not be granted pursuant to Rules 12(b)(6) or 8.

As to Defendant Sherry Spielman, the Court finds that the Trustee's First Amended Complaint sufficiently alleges that she received a fraudulent transfer and that she aided and abetted a breach of fiduciary duty. The motion to dismiss as to Defendant Sherry Spielman will not be granted pursuant to Rules 12(b)(6) and 8.

The Trustee's First Amended Complaint sufficiently alleges fraudulent transfer and alter ego claims as to Defendant RWD Properties, LLC. The motion to dismiss as to Defendant RWD Properties, LLC will not be granted pursuant to Rules 12(b)(6) and 8.

The Trustee's First Amended Complaint sufficiently alleges claims of fraudulent transfer against Defendant RS Windows & Doors, LLC. The motion to dismiss as to Defendant RS Windows & Doors, LLC will not be granted pursuant to Rules 12(b)(6) and 8.

## III.  STATUTE OF LIMITATIONS DEFENSE

The movants argue that the fraudulent conveyance Counts I, II, III, IV(B) and IV(C) are time-barred because the transfers occurred on November 4, 2004, more than four years before the bankruptcy case was filed herein on December 12, 2008. The Trustee has responded that he relies on a Bankruptcy Code provision that allows him to take advantage of a longer limitations period.

Illinois law provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a

creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

> A) was engaged or was about to engage in a business or a transaction f or which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a).

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

740 ILCS 160/6.

A cause of action with respect to a fraudulent transfer or obligation under this Act is extinguished unless action is brought:

(a) under paragraph (1) of subsection (a) of Section 5, within 4 years after the transfer was made or obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;

(b) under paragraph (2) of subsection (a) of Section 5 or subsection (a) of Section 6, within 4 years after the transfer was made or the obligation was incurred; or

(c) under subsection (b) of Section 6, within one year after the transfer was made or the obligation was incurred.

740 ILCS 160/10.

The one-year discovery rule applies to section 160/5 actual fraud claims.

The Trustee acknowledges that the limitation period is four years. However, he asserts that under 11 U.S.C. § 544(b) he can use the statute of limitations available to any creditor of the Debtor as of the commencement of the bankruptcy case. Section 544(b) provides that "[e]xcept as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title. 11 U.S.C. § 544(b).

In *Greater Southeast Cmty. Hosp. Corp. I* v. HCA, Inc., (*In re Greater Southeast Cmty. Hosp.*) 365 B.R. 293, 304 (Bankr.D.Dist.Col. 2006), the court in discussing the legislative history of section 544(b) noted the following:

> Congress crafted § 544(b) to give the representative of the estate the ability to avoid any transaction that any unsecured creditor of the estate could have avoided as of the petition date. The estate representative steps into the shoes of each such unsecured creditor and is cloaked with the rights of that creditor. If an unsecured creditor of the estate could have avoided a transaction under state law despite the existence of a state statute of limitations on that claim because the creditor was acting in a "governmental capacity," so too can the estate representative avoid the transfer under § 544(b).

*In re Greater Southeast Cmty. Hosp.*, 365 B.R. at 304.

The Trustee argues that because the Internal Revenue Service ("IRS") is a creditor he may use the IRS' ten-year limitations period.[1] "Under 11 U.S.C. § 544(b), the Trustee may use the statute of limitations available to any actual creditor of the debtor as of the commencement of the case." *In re Polichuk,* 2010 WL 4878789 *7 (Bankr. E.D. Pa. Nov. 23, 2010). Section 544(b) allows a Trustee to step into the shoes of a creditor that is not subject to an otherwise applicable state law limitation period. His position is that his claims are timely under 26 U.S.C. § § 6501, 6502 which allow the IRS, under certain circumstances, to collect taxes "by levy or by a proceeding in court, but only if the levy is made or the proceeding begun (1) within 10 years after the assessment of the tax . . . ." 26 U.S.C. § 6502(a)(1).

---

[1]The Internal Revenue Service is listed as an unsecured priority creditor on the Debtor's Schedule E. In the Chapter 11 context when a debt is scheduled, the creditor does not have to file a claim. *See* 11 U.S.C. § 1111(a) "A proof of claim is deemed filed under section 501 of this title for any claim or interest that appears in the schedule filed . . .except a claim or interest that is scheduled as disputed, contingent or unliquidated." However, there is no analog to section 1111(a) in Chapter 7.

The Defendants argue that the IRS is not a creditor because it has not filed a claim and for that reason does not have an allowable claim. The Court notes that section 544(b) refers to a creditor who holds a claim allowable under section 502. Section 502 provides that a claim is deemed allowed once a proof of claim has been filed as to it, unless a party in interest objects. 11 U.S.C. § 502. The issue is whether the Trustee must show that the IRS holds an allowable claim, i.e., a filed claim, before he may use the avoidance power of section 544(b). The case law is not clear on this point.

In 1997 in *In re Leonard,* 125 F.3d 543, 544 the Seventh Circuit stated that "if any unsecured creditor could reach an asset of the debtor outside bankruptcy, the Trustee can use § 544(b) to obtain that asset for the estate." In response to a concern that the trustee had not identified the creditor who could set aside a transaction, the Seventh Circuit stated that a trustee need not do so. *Id.* Without specifically saying that the creditor had to file a claim, the court noted that thirteen claims had been filed and that "the Trustee can assume the position of any one of them." *Id.* In 1998 the Seventh Circuit stated regarding a trustee's use of section 544(b) that "[t]he trustee need not identify the creditor, so long as the unsecured creditor exists." *Image Worldwide, Ltd. v. Parkway Bank & Trust,* 139 F.3d 574, 576 (7th Cir. 1998) (quoting *In re Leonard,* at 544).

The Trustee argued at the August 25, 2011 hearing of this motion that the IRS could file a claim at any time before assets are distributed to creditors. The Trustee is correct. The IRS can file a late claim and secure a distribution.[2]  *See e.g. Internal*

---

[2] 11 U.S.C. § 726 provides:
> (a) Except as provided in section 510 of this title, property of the estate shall be distributed–
> (1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title, proof of which is timely filed under section 501 of this title or tardily filed on or before the earlier of

*Revenue Service v. Century Boat Company (In re Century Boat Company)*, 986 F.2d 154, 158 (6th Cir. 1993) ("An untimely priority claim filed by the IRS may be entitled to distribution under Section 726(a)(1) even though the claimant had notice of the bankruptcy petition in time to permit the filing of a timely proof of claim."); *In re Profco, Inc.*, 339 B.R. 614 (Bankr. S.D. Texas 2005) (noting that the IRS' untimely filed unsecured claim was payable in a Chapter 7 case after payment of other general unsecured claims). However, until the IRS files a claim and have it become allowable as required by section 544(b), the Trustee cannot rely on the IRS' ten-year limitations period.

The Court notes that Federal Rule of Bankruptcy Procedure 3004 provides in part that "[i]f a creditor does not timely file a proof of claim under Rule 3002(c). . ., the debtor or trustee may file a proof of claim within 30 days after the expiration of the time for filing claims prescribed by Rule 3002(c). . . ." The claims bar date herein was June 29, 2009. Governmental agencies could have filed proofs of claim within six months of the order of relief, December 12, 2008, by approximately June 12, 2009, or by the longer June 29, 2009 date.

Federal Rule of Bankruptcy Procedure 9006(b)(1) provides:

> [W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of the court, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the *request* therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) *on motion* made after the expiration of the specified period permit the act to be done where the

---

(A) the date that is 10 days after the mailing to creditors of the summary of the trustee's final report; or
(B) the date on which the trustee commences final distribution under this section;

-21-

failure to act was the result of excusable neglect.

(emphasis added).

Subsection (b)(2) provides that "[t]he court may not enlarge the time for taking actions under Rules 1007(d), 2003(a) and (d), 7052, 9023, and 9024." This provision does not bar enlargement under Federal Rule of Bankruptcy Procedure 3004, which as noted above, allows the debtor or a trustee to file a claim on behalf of a creditor.

Subsection (b)(3) provides that "[t]he court may enlarge the time for taking actions under Rules 1006(b)(2), 1017(e), 3002(c), 4003(b), 4004(a), 4007(c), 4008(a), 8002, and 9033, only to the extent and under the conditions stated in those rules." This provision does not limit the operation of Federal Rule of Bankruptcy Procedure 3004, which governs the filing of claims by a debtor or a trustee on behalf of a creditor.

The Defendants' statute of limitations defense is granted as to the fraudulent transfer claims asserted pursuant to 740 ILCS 160/6 in Counts II, III, IV(C) and VI. The generous IRS limitation provision is not available unless the IRS files it own claim or the Trustee files a claim on behalf of the IRS. Those Counts are dismissed without prejudice. The Trustee may file a Second Amended Complaint herein within 60 days of the issuance of this order.

The one-year discovery rule may apply to grant the Trustee an extra year to file the fraudulent transfer claims asserted under 740 ILCS 160/5 and the related alter ego claims in Counts I, IV, IV(A), IV(B) and V. For that reason the motion to dismiss is denied as to Counts I, IV, IV(A), IV(B) and V.

The statute of limitations defense is denied as to Count XI which asserts

-22-

claims alleging violations of fiduciary duties. In Illinois the statute of limitations for breach of fiduciary duty claims is five years. *Armstrong v. Guigler,* 174 Ill.2d 281, 294 (1996); *Havoco of America, Ltd. v. Sumitomo Corp. of America,* 972 F.2d 1332 (7th Cir. 1992); 735 ILCS 5/13-205.

The Court notes that the Defendants addressed the discovery rule in their memorandum in support of their motion. "To the extent the Trustee purports to bring Counts I and IV(B) under paragraph (1) of subsection (a) of Section 5 of the UFTA (actual fraud), the Complaint is time-barred because the Goose Island Transaction was clearly "discoverable" by actual creditors–and, again, the Trustee is standing in the shoes of an actual creditor under Section 544(b), *In re Swiontek,* 376 B.R. at 859–when the transaction was finalized on November 4, 2004." *See* Memorandum of Law in Support of the Spielman Defendants' Motion to Dismiss Counts I-VI, and XI of the Trustee's First Amended Adversary Complaint (Dkt. no. 94, p. 9). The Trustee responded that the application of the discovery rule is an issue of fact. This Court agrees. The statute of limitations is an affirmative defense that has to be plead and proved. At this point the Defendants have not plead that the discovery rule cannot extend the limitations period by one year as allowed by 740 ILCS 160/10(a). The Fifth Circuit stated in ruling on the issue of whether a plaintiff has to plead the discovery rule that "[t]he discovery rule need not be specifically plead in federal court." *TIG Ins. Co. v. Aon Re, Inc.,* 521 F.3d 351, 357 (5th Cir. 2008). "Under Federal Rule of Civil Procedure 8, it is enough that the plaintiff plead sufficient facts to put the defense on notice of the theories on which the complaint is based." *Id.*

## IV. ALTER EGO ISSUES

The movants argue that where the questioned transactions involve non-debtors as both the grantor and the grantee, the properties involved are not property of the

Debtor's estate as the Debtor did not own the properties involved.  The Trustee has made alter ego claims which, if proven, could bring the properties involved in the transactions into the bankruptcy estate as of the date that the petition for bankruptcy relief was filed.  "It is well established that property of the Debtor in the possession, custody and control of its alter ego comprises property of the estate at the commencement of the case, and that bankruptcy courts have the power to disregard separate corporate entities so as to reach the assets of its non-debtor alter ego to satisfy debts of the Debtor." *In re Sklarin,* 69 B.R. 949, 954 (Bankr. S.D. Fla. 1987) (quoting *In re F & C Services, Inc.,* 44 B.R. 863, 868 (S.D. Fla. 1984)).  *See In re Sharif,* 447 B.R. 853, 867 (Bankr. N.D. Ill.  2011) (quoting *In re Sklarin* and *In re F & C Services, Inc.*).

The alter ego claims are not separate causes of action.  "It is merely a procedural means of allowing liability on a substantive claim . . . ."  *Int'l Financial Services Corp. v. Chromas Technologies*, 356 F.3d 731, 736-37 (7th Cir. 2004).  Under Illinois law a party seeking to disregard corporate formalities because a targeted corporation is merely the alter ego of the dominating personality "must show that (1) there is such a unity of interest and ownership that the separate personalities of the corporations and the individual no longer exist; and (2) circumstances are such that adhering to the fiction of a separate corporate existence would promote *injustice* or *inequity.  Int'l Financial Services,* at 736.  Since alter ego claims are not separate causes of action the Court will consider them as part of the relief requested in fraudulent conveyance claims.

## V.  BREACH OF FIDUCIARY DUTY ISSUES

The movants argue that the Trustee's breach of fiduciary duty claims fail because they are derivative of his other inadequately plead claims.  This argument is unconvincing.  Under Illinois law corporate officers owe their corporations a fiduciary

-24-

duty to act in the corporation's best interests and not in their own interests to the detriment of the corporation. The various allegations herein, if true, satisfy the elements required to adequately allege that several of the Defendants failed to act in the Debtor's best interests.

## VI. CONCLUSION

The Motion to Dismiss on behalf of Defendants Ronald Spielman, Sherry Spielman, RWD Properties, LLC and RS Windows & Doors, LLC is granted as to Counts II, III, IV(C) and VI because the IRS' limitation period is not available. Those Counts are dismissed without prejudice.

Because the discovery rule may apply to the 740 ILCS 160/5 claims, the Motion to Dismiss is denied as to Counts I, IV, IV(A), IV(B) and V.

The Motion to Dismiss is denied as to Count XI which has a five-year limitations period.

The Trustee may file a Second Amended Complaint herein within 60 days of the issuance of this Order.

This Adversary Proceeding is set for a Status Hearing on October 26, 2011 at 9:30 a.m.

DATED: October 12, 2011                    ENTER:

_Jacqueline P. Cox_
_J.P.Cox_
_____
Jacqueline P. Cox
U.S. Bankruptcy Judge